UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

| | |
|---|---|
| DYLAN MARDIS, | ) |
| | ) |
| Plaintiff(s), | ) |
| | ) |
| vs. | ) Case No. 2:08CV63 JCH |
| | ) |
| HANNIBAL PUBLIC SCHOOL DISTRICT, #60, | ) |
| | ) |
| and | ) |
| | ) |
| JILL JANES, | ) |
| | ) |
| Defendant(s). | ) |

## **MEMORANDUM AND ORDER**

### **BACKGROUND**

On October 24, 2006, Plaintiff Dylan Mardis was chatting via "instant message" on a computer with a classmate, Carly Moore. During the course of their conversation, Plaintiff told Carly that he was going to get a gun and kill certain classmates. Plaintiff was arrested by police for making those threats and, upon order of the juvenile court, was admitted to the psychiatric ward of the Lakeland Regional Hospital. Plaintiff was discharged from Lakeland on October 30, 2006, and returned to juvenile court. Plaintiff remained in juvenile detention until February 9, 2007.

Plaintiff was a sophomore in Hannibal Public School District #60 ("the District") at the time of the alleged threats. On October 31, 2006, the District suspended Plaintiff for ten days for his threatening communications. On November 3, 2006, the District's Superintendent, Dr. Jill Janes, extended Plaintiff's suspension through the end of the 2006-2007 school year.

Plaintiff's parents appealed the suspension to the District's Board of Education ("the Board"). On February 21, 2007, the Board conducted an appeals hearing. On March 1, 2007, the Board

upheld the decision to suspend Plaintiff until the end of the school year. Plaintiff later completed his high school education.

In this action, Plaintiff seeks an administrative review of his discipline and claims that the Board's suspension of him violated Plaintiff's First Amendment rights. On November 9, 2009, Defendants filed their Motion for Summary Judgment on Plaintiff's claims (Doc. No. 41).

## **SUMMARY JUDGMENT STANDARD**

The Court may grant a motion for summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Citrate, 477 U.S. 317, 322 (1986). The substantive law determines which facts are critical and which are irrelevant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Only disputes over facts that might affect the outcome will properly preclude summary judgment. Id. Summary judgment is not proper if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Id.

A moving party always bears the burden of informing the Court of the basis of its motion. Celotex Corp., 477 U.S. at 323. Once the moving party discharges this burden, the nonmoving party must set forth specific facts demonstrating that there is a dispute as to a genuine issue of material fact, not the "mere existence of some alleged factual dispute." Fed. R. Civ. P. 56(e); Anderson, 477 U.S. at 248. The nonmoving party may not rest upon mere allegations or denials of his pleading. Anderson, 477 U.S. at 258. "[A] properly supported motion for summary judgment is not defeated by self-serving affidavits." Conolly v. Clark, 457 F.3d 872, 876 (8th Cir. 2006) (citing Davidson & Assocs. v. Jung, 422 F.3d 630, 638 (8th Cir. 2005)).

In passing on a motion for summary judgment, the Court must view the facts in the light most favorable to the nonmoving party, and all justifiable inferences are to be drawn in his favor. Celotex Corp., 477 U.S. at 331, n.2. The Court's function is not to weigh the evidence but to determine whether there is a genuine issue for trial. Anderson, 477 U.S. at 249.

## DISCUSSION

### I. DUE PROCESS CLAIM

This Court dismissed Plaintiff's substantive and procedural due process claims for failure to state a claim. (Doc. No. 29). The Court allowed Plaintiff to replead his claims, and Plaintiff filed a two-count Amended Complaint, alleging claims for Administrative Review (Count I) and under 42 U.S.C. §1983 (Count II). Curiously, Plaintiff's Amended Complaint was virtually identical to the First Amended Petition that was the subject of the prior motion to dismiss. See Doc. No. 1-2, pp. 5-9; Doc. No. 32. Accordingly, the Court need not address Plaintiff's due process claim, which was previously dismissed. See Doc. No. 29; see also Defendants' Memorandum of Law in Support of their Motion for Summary Judgment ("Memorandum in Support"), Doc. No. 42, p. 14, n.7.

### II. 42 U.S.C. § 1983 (COUNT II)

Initially, Plaintiff claims that this case should not be treated as a "school speech case" because it involves in-home instant messages created on private computers during non-school hours. (Plaintiffs DJM, DM and JM's Memorandum in Opposition to Defendants' Motion for Summary Judgment ("Response"), Doc. No. 45, p. 4). Plaintiff asserts that he had no intention that his private communications would reach the alleged victims or the "school yard" at large. (Response, p. 4). Plaintiff claims that there is no precedent for applying school speech cases to a situation such as this because all United States Supreme Court cases censoring or punishing student speech have involved on-campus speech or speech at school-sponsored activities or functions. (Response, p. 5, n. 1 (citing

Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503 (1969); Bethel Sch. Dist. v. Fraser, 478 U.S. 675 (1986); Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260 (1988); Morse v. Frederick, 551 U.S. 393 (2007)).

The Supreme Court acknowledged in Tinker v. Des Moines Independent Community Sch. Dist. that students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." 393 U.S. at 506. At the same time, the Supreme Court also has held that "'the constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings,' and that the rights of students 'must be applied in light of the special characteristics of the school environment.'" Morse, 551 U.S. at 396-97 (quoting Bethel School Dist. No. 403, 478 U.S. at 682; Hazelwood School Dist., 484 U.S. at 266.

Plaintiff asserts that the Court should not apply the Tinker test because Plaintiff's private internet communications were not "student speech" in that they were intended to be saved, published or shared with anyone except his instant message "confidant." (Response, pp. 5-6). Plaintiff, instead, claims that Porter v. Ascension Parish Sch. Bd., 393 F.3d 608 (5th Cir. 2004) is an analogous case and supports a finding that Plaintiff's communications were not "true threats."[1] In Porter, fourteen year old Adam Porter sketched a drawing of his school in the privacy of his home. Id. at 611. Adam's sketch depicted "the school under a state of siege by a gasoline tanker truck, missile launcher, helicopter, and various armed persons" and contained "obscenities and racial epithets directed at characters in the drawing." Id. At the time, Adam showed the picture only to his mother, younger brother and a friend, who was living with the family. Id. Two years later, Adam's younger brother brought the sketch pad to school, and the sketch pad was confiscated. Id. Upon questioning from

---

[1] Notably, Porter cites approvingly to Doe v. Pulaski County Special Sch. Dist., 306 F.3d 616 (8th Cir. 2002) for application of First Amendment principles to "an alleged threat made by a student off-campus but carried on-campus by another student." Porter, 393 F.3d at 617.

school administrators, Adam admitted to drawing the sketch. Id. at 612. Faced with the threat of expulsion, Adam waived his right to a hearing and enrolled in an alternative school. Id.

The Porter court determined that it did not need to decide whether Adam's drawing constituted a "true threat" because "Adam did not intentionally or knowingly communicate his drawing in a way sufficient to remove it from the protection of the First Amendment." Id. at 617. The Porter court noted that Adam showed his sketch only to his mother, brother and a friend and, thus, the communication was confined to his home for two years before the sketch "serendipitously" reached his school. Id. Because the sketch was confined to Adam's home for more than two years, and its exposure to Adam's school was purely accidental, the Porter court determined that Adam's private drawing did not lose its First Amendment protection. Id. at 617-18. The Fifth Circuit held that Adam's drawing did not constitute student speech because it was completed at his home, stored for two years and never intended by him to be brought to campus. Id. at 615. The Porter court noted that a "number of courts have applied the test in Tinker when analyzing off-campus speech brought onto the school campus." Id. at 615, n. 22 (citing cases). The Porter court distinguished the cases applying the Tinker test to off-campus speech because of the two year time lapse between the creation of the sketch and its unintended publication on school grounds. Id.

Several courts of appeal, including this circuit, have applied "school speech" law to cases where the communications occurred off of school grounds but their effects reverberated to the classroom. See Doe v. Pulaski County Special Sch. Dist., 306 F.3d 616 (8th Cir. 2002); Wisniewski v. Bd. of Ed. Weedsport Cent. Sch. Dist., 494 F.3d 34, 39 (2d Cir. 2007) ("off-campus conduct can create a foreseeable risk of substantial disruption within a school"); Sullivan v. Houston Ind. Sch. Dist., 475 F.2d 1071, 1075-77 (5th Cir. 1973) (school could punish student for underground newspaper distributed off-campus but near school grounds); see also J.S. v. Bethlehem Area Sch.

Dist., 757 A.2d 412, 418-22 (Pa. Cmwlth. 2000) (upheld permanent expulsion of student for using her home computer to put a picture of her teacher's severed head on her website and soliciting funds for her execution; "it is evident that the courts have allowed school officials to discipline students for conduct occurring off of school premises where it is established that the conduct materially and substantially interferes with the educational process"). For example, in Doe v. Pulaski County Special Sch. Dist., a male student was expelled for the remainder of the school year for writing a threatening letter to an ex-girlfriend. 306 F.3d at 620. The student wrote the threatening letter at his home and showed the letter to a friend. Id. at 619. The plaintiff's friend stole the letter from plaintiff's home and showed it to plaintiff's ex-girlfriend, who made the school aware of the letter. Id. at 619-20. The district court concluded that the letter was not a "true threat" of violence, which may be punished without offending an individual's First Amendment rights, because the plaintiff had prepared the letter at home and did not intend to deliver it to" his ex-girlfriend. Id. at 620. On appeal, the Eighth Circuit stated that "a true threat is a statement that a reasonable recipient would have interpreted as a serious expression of an intent to harm or cause injury to another." Id. at 624; see also Lovell v. Poway Unified Sch. Dist., 90 F.3d 367, 372 (9th Cir. 1996) (Ninth Circuit's test for "true threat" is "whether a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of intent to harm or assault"). The Eighth Circuit reversed the District Court and held that the letter constituted a "true threat." Doe, 306 F.3d at 624-27.

Although Plaintiff attempts to fit this case within the parameters of Porter, this Court will apply "school speech" case law from Tinker and Doe. Plaintiff claims that, like Porter, neither he, nor any reasonable person, would have expected that his "confidant" would publish the conversation to anyone at the school. (Response, p. 6). Plaintiff, however, ignores the Porter court's emphasis

on the 2 year time lapse between the creation of the sketch and its publication on school grounds as its basis for not applying the Tinker test. Plaintiff intentionally communicated his alleged threats to a third party "confidant" outside his home. This communication was not held in abeyance for several years but, instead, his confidant immediately forwarded his statements to school administrators within mere hours. Unlike Porter, where the allegedly threatening communication was not brought to the school community for two years, Plaintiff's communication disrupted the school community virtually instantaneously. The Court finds it reasonable to apply the "school speech" law of Doe and Tinker to Plaintiff's case and finds that Plaintiff's speech does not fall within the limited circumstances in Porter.

### A. True Threats

The First Amendment, applicable to the States through the Fourteenth Amendment, provides that "Congress shall make no law . . . abridging the freedom of speech." Speech, particularly private speech within the home, is typically protected by the Free Speech Clause of the First Amendment. "The protections afforded by the First Amendment, however, are not absolute, and we have long recognized that the government may regulate certain categories of expression consistent with the Constitution." Virginia v. Black, 538 U.S. 343, 358 (2003) (citing Chaplinsky v. New Hampshire, 315 U.S. 568, 571-72 (1942). As relevant to this case, the "First Amendment ... permits a State to ban a 'true threat.'" Virginia, 538 U.S. at 359 (citing Watts v. United States, 394 U.S. 705, 708, 22 L. Ed. 2d 664, 89 S. Ct. 1399 (1969) (per curiam); R. A. V. v. St. Paul, 505 U.S. 377, 388 (1992) ("Threats of violence are outside the First Amendment"); Madsen v. Women's Health Center, Inc., 512 U.S. 753, 774 (1994); Schenck v. Pro-Choice Network of Western N. Y., 519 U.S. 357, 373 (1997)). "'True threats' encompass those statements where the speaker means to communicate

a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." Virginia, 538 U.S. at 359.

Plaintiff claims that Defendants violated his First Amendment rights by suspending him from school based upon the alleged threats he communicated to Carly Moore via instant message from his home computer. Defendants claim Plaintiff's instant message communications with Moore constitute true threats outside of the protection of the First Amendment. As discussed herein, based upon this circuit's case law, the Court finds that Plaintiff's instant message communications constitute "true threats" and are not protected by the First Amendment.

        1.      Intent to Communicate

Plaintiff asserts that his communications cannot be considered a "true threat" because he claims that he did not intent to, nor did he, communicate his statements to the alleged victims. See, e.g., Response, pp. 5-6 ("it was unintended that there would be any record of the conversation which could be published or shared with anyone"); Response, p. 8 (Plaintiff did not intend "for the message to be communicated directly or indirectly to any alleged victim"); Response, p. 10 ("DJM's instant messages were never directly communicated to any alleged victim."). Plaintiff bases this assertion primarily upon his reading of U.S. v. Dinwiddie, 76 F.3d 913 (8th Cir. 1996). (Response, p. 10). Therein, the defendant was accused of violating the Freedom of Access to Clinic Entrances Act of 1994, 18 U.S.C. § 248 ("FACE"). The Court determined that Dinwiddie violated FACE by, among other things, threatening members of the staff of a Planned Parenthood clinic. To determine if Dinwiddie's statements constituted a threat of force, the Eighth Circuit analyzed, among other things, "whether the threat was communicated directly to its victim." Dinwiddie, 76 F.3d at 925 (citing U.S. v. Bellrichard, 994 F.2d 1318, 1321 (8th Cir. 1993)). The Dinwiddie court ultimately held that the defendant's statements constituted "true threats" because the statements were not conditional, the

recipient of the threats was intimidated and the statements were communicated directly to the intended recipient/victim. Id. at 926.

Eighth Circuit law regarding what constitutes a "true threat" is not as limited as Plaintiff states. "In determining whether a statement amounts to an unprotected threat, there is no requirement that the speaker intended to carry out the threat, nor is there any requirement that the speaker was capable of carrying out the purported threat of violence." Doe, 306 F.3d at 624 (citing Planned Parenthood of the Colombia/Willamette, Inc. v. Am. Coalition of Life Activists, 290 F.3d 1058, 1075 (9th Cir. 2002)). "However, the speaker must have intentionally or knowingly communicated the statement in question to someone before he or she may be punished or disciplined for it." Doe, 306 F.3d at 624 (citing Planned Parenthood, 290 F.3d at 1075). The requirement that the threat be communicated is satisfied if the "speaker communicates the statement to the object of the purported threat *or to a third party*." Doe, 306 F.3d at 624 (emphasis added). In Doe, the court held that the plaintiff intended to communicate his letter and was "therefore accountable if a reasonable recipient would have viewed the letter as a threat." Id. Under the Doe analysis, communication to any third party, not just the intended victim, is sufficient to constitute intent to communicate a threat. Id.

Moreover, even if communication to a confidant is not sufficient under the Doe test, the Court finds that Plaintiff should have reasonably foreseen that his statements would have been communicated to his alleged victims. Although Plaintiff would like to characterize the forwarding of his statements to other students and school administrators as unforeseen, accidental or unintended, the Court notes that in this digital age, a reasonable person could foresee the transmittal of internet communications. As evidence of this, Plaintiff was aware that Moore was not a reliable "confidant." During their instant messaging conversation, Moore told Plaintiff that she told Plaintiff's ex-girlfriend,

Lauren, about his plan. See Doc. No. 42-2, p. 10 (Moore told Plaintiff she told Lauren about his plan "because I thought that was what had u depressed was cuz lauren and thats why you wanted to go killing people"); see also Doc. No. 45-9, p. 2 (Moore told Leigh Allen that she also told Lauren "since [she's] the one who broke up with him."). Plaintiff either knew or reasonably should have known that his communications would have reached his intended victims or school authorities.

This Court finds that Plaintiff's instant messages cross "the boundary of protected speech and constitutes student conduct that poses a reasonably foreseeable risk that the [message] would come to the attention of school authorities[.]" Wisniewski, 494 F.3d at 38. Accordingly, the Court finds that Plaintiff had the requisite intent to communicate his threat because he communicated his statements to Carly Moore.

### 2. Reasonable Recipient's Perception of the Letter.

Plaintiff claims that under the test in Watts v. U.S., 394 U.S. 705 (1969), Plaintiff's statement cannot be interpreted as "true threats."[2] Throughout Plaintiff's briefing, he argues that he obviously was not seriously threatening his fellow students in his communications with Carly Moore. (Response, p. 9). Plaintiff notes that Moore responded with encouragement and laughter, which indicated the comedic nature of their discourse and also the non-threatened response of the listener. (Id.) For example, Moore suggested that Plaintiff should shoot all of the black women because "[t]he death of a black person cracks me up." (Id.) Plaintiff also claims that his statements could not be considered threats because they were conditional and equivocal.

Whether or not a reasonable person would believe the statements were a true threat is a question of law. See Doe, 306 F.3d 626 (holding a reasonable recipient would have perceived the letter as a serious expression of an intent to harm). In Doe, there was no question that the four page

---

[2]Watts, however, was a criminal case that provides a nonexclusive list of factors for a court to consider.

letter constituted a "true threat" given the persistent use of sexually derogatory and violent terms throughout the letter. Doe, 306 F.3d at 625. The Doe plaintiff's letter also included a passage stating that his ex-girlfriend should not go to sleep because plaintiff would be under her bed with a knife. Id. The Doe court held that a reasonable 13-year-old female recipient would have viewed the letter as a true threat. Id. at 625-27.

Although this is a closer case than in Doe, the Court nevertheless finds that a reasonable recipient would believe that Plaintiff's communications constituted true threats.[3] Plaintiff's statements, including specific information about Plaintiff's state of mind and his access to weapons, made his threats believable. Moore knew that Plaintiff was depressed because he was rejected by a potential love interest. Plaintiff told Moore that he intended to take a gun to school and shoot everyone he hates and then shoot himself. (Doc. No. 42-2, pp. 7, 10). Plaintiff told Moore that "he wanted Hannibal to be known for something." (Doc. No. 42-2, pp. 7, 10). Plaintiff expressed his desire to kill at least five classmates at Hannibal High School. (Plaintiff DJM's Response to Defendants' First Request for Admissions ("Admissions"), Doc. No. 42-2, ¶¶ 7-9). Plaintiff told Moore that his friend had a .357 magnum pistol. (Admissions, ¶ 6).

Also, Plaintiff's claims that he and Moore were engaged in an inside joke is belied by Moore's report of Plaintiff's threatening and frightening behavior. Moore was concerned enough by Plaintiff's

---

[3]Plaintiff argues that Moore's statements to principal Darin Powell and Leigh Allen are inadmissible hearsay. (Plaintiff's Statement of Controverted Facts in Response to Defendants' Statement of Uncontroverted Material Facts, Doc. No. 45-3). Defendants correctly point out, however, that Moore's statements to school officials satisfy the state of mind exception to the hearsay rule. Fed. R. Evid. 803(1). Moore's statements are relevant to whether her reaction and state of mind were that of a "reasonable person." In addition, hearsay statements are admissible in administrative procedures, such as Plaintiff's suspension hearing. See R.S. Mo. § 536.070(7) ("Evidence to which an objection is sustained shall, at the request of the party seeking to introduce the same, or at the instance of the agency, nevertheless be heard and preserved in the record, together with any cross-examination with respect thereto and any rebuttal thereof, unless it is wholly irrelevant, repetitious, privileged, or unduly long.").

statements that she contacted a trusted adult, Leigh Allen. (Doc. No. 42-2, pp. 7-9; Doc. No. 45-9). Allen had contacts at the District. (Doc. No. 42-2, pp. 8-9; Doc. No. 45-9). Allen urged Moore to report the incident and, subsequently, Moore communicated with Powell. (Doc. No. 45-10).

In another attempt to demonstrate the non-serious nature of Plaintiff's threats to kill his fellow students, Plaintiff asks the Court to evaluate Plaintiff's statements in the "context of the culture and society in which we live." (Response, p. 10). Plaintiff points out numerous obscure references to threats of killing, including a musical quintet and a song by an Estonian punk rock band. (Response, pp. 10-11). Plaintiff's counsel, however, fails to take into account other relevant cultural events that could influence a reasonable recipient. For example, the Columbine, Jonesboro and Virginia Tech massacres have made students and schools more sensitive to threats of violence. See Doe, 306 F.3d at 626, n. 4. Although Plaintiff would suggest that Defendants overreacted to normal teenage angst, the Court cannot overlook the school tragedies during the past two decades and their effect on students and school administrators.

Viewing the entire factual circumstances surrounding the communications, the Court concludes that a reasonable recipient would have viewed Plaintiff's comments to Moore as "true threats." The Court holds that Defendants acted entirely within their permissible authority in imposing sanctions upon Plaintiff in response to his threatening speech. The Court finds that Plaintiff's instant message communication amounted to a true threat and school administrators did not violate Plaintiff's First Amendment rights by suspending Plaintiff on this basis. Because Plaintiff's communications were true threats outside the protections of the First Amendment, the Court grants Defendants' Motion for Summary Judgment on Count II.

B.   Disruption of School

In the alternative, Defendants argue that they were permitted, under <u>Tinker v. Des Moines Independent Community School District</u>, to punish Plaintiff for his speech because it caused a substantial disruption for the school. Plaintiff claims that there is a genuine issue of fact regarding whether there was a "sufficient disruption or threat of disruption to justify a year-long suspension in this case." (Response, p. 13).

<u>Tinker</u> provides that school officials may regulate student speech when they can demonstrate that such speech would "substantially interfere with the work of the school or impinge upon the rights of other students." <u>Tinker</u>, 393 U.S. at 509. In <u>Tinker</u>, the Supreme Court held that a school's regulation prohibiting students from wearing armbands to school and suspending students refusing to remove the armbands was an unconstitutional denial of the students' right to free expression. <u>Id.</u> at 514. The plaintiffs wore black armbands in protest of the Vietnam war. <u>Id.</u> at 504. Having heard of the proposed protest, the school passed a policy that any student who refused to remove an armband when asked would be suspended. <u>Id.</u> The school suspended students who violated this policy. <u>Id.</u> The Supreme Court reversed the decisions of the district court and the Eighth Circuit, which both had upheld "the constitutionality of the school authorities' action on the ground that it was reasonable in order to prevent disturbance of school discipline." <u>Id.</u> at 504-05. The Supreme Court criticized school officials for banning and punishing student for a "silent, passive expression of opinion, unaccompanied by any disorder or disturbance" on the part of students. <u>Id.</u> at 508. School officials were unable to "show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." <u>Id.</u> at 509. The <u>Tinker</u> court found "no showing that engaging in the forbidden conduct would 'materially and substantially interfere with the requirements of appropriate discipline in the operation of the school[.]'" <u>Id.</u> (quoting <u>Burnside v. Byars</u>, 363 F.2d 744, 749 (5th Cir. 1966)).

1. Complaints

Defendants present evidence of "substantial disruption" based upon complaints made by both parents and students because of Plaintiff's threatening communications. Powell claims that he spoke with twenty-five to thirty parents from October 24, 2006 through November 3, 2006. (Defendants' Statement of Uncontroverted Material Facts ("DSUMF"), Doc. No. 42, pp. 3-14, ¶ 30).[4] Janes and Powell stated that they were primarily asked by concerned parents: (1) whether their children were identified Plaintiff's potential targets, and (2) how was the District protecting their children. (DSUMF, ¶ 33). Parents told Powell that they were scared to sent their children to school and indicated that they would not send their children to school. (DSUMF, ¶ 34).[5] Powell also spoke with students, who wanted to know if Plaintiff targeted them. (DSUMF, ¶ 35). Powell and Janes also spent time talking to local media about the reports. (DSUMF, ¶¶ 38-39). Powell testified that addressing Plaintiff's threats occupied the majority of his time from October 24, 2006 through November 3, 2006. (DSUMF, ¶ 36). Powell and Janes assert that their educational duties were interrupted to deal with Plaintiff's threats. (DSUMF, ¶ 37).

Plaintiff claims that any phone calls made to school administration or other disruptions likely resulted from the Hannibal internet forum "'Hit List' at HHS" rather than any alleged threats made by Plaintiff. (Response, p. 13). Plaintiff claims that any disruption that my have occurred was due to the misinformation on the internet, and are not attributable to Plaintiff's statements.

Plaintiff's argument is a red herring. Plaintiff attempts to blame the disruption to the school on the purported overreaction of some concerned parents to some erroneous information about the

---

[4]Powell spoke with more parents after November 3, 2006, but he stopped keeping track of their names. (DSUMF, ¶ 31).

[5]Unfortunately, the school's method of recording absenteeism typically does not indicate why a particular student was absent on a given day. (Doc. No. 45-17, pp. 11-14).

context and contents of Plaintiff's threats. Plaintiff fails to recognize that the internet website and the parents' reactions were responses (although perhaps indirectly) to Plaintiff's alleged threats. It is reasonably foreseeable that parents would seek information in response to Plaintiff's threats of bringing a gun to school and shooting his classmates. Plaintiff's threats, not the website, were the original impetus to the parents' reactions and complaint to the school.

Moreover, the disruption caused by parents' and students' complaint is more than the mere discomfort and unpleasantness experienced in Tinker. Powell had to devote the majority of his time for a week to dealing with complaints. Parents threatened to remove their children from school, which certainly constitutes a significant disruption to the educational process. Accordingly, the Court finds that parents' complaints caused a substantial disruption to the school because of Plaintiff's threats.

### 2. Security

As additional evidence of the substantial disruption to the school, Defendants assert that the school was forced to significantly increase its security in response to Plaintiff's threats. Plaintiff claims that there is a "well delineated dispute concerning whether there were any security changes" because of Plaintiff's communications. (Response, p. 13). Plaintiff asserts that the increased security was the result of recommendations by the Hannibal police department, not because of Plaintiff's threats. In support of this position, Plaintiff claims that the security after the October 24, 2006 communications was similar to the security situation currently at Hannibal High School.[6]

The evidence before the Court indicates that, although recommendations were made to increase security at Hannibal High School before the October 26, 2006 incident, those recommendations were not implemented until, and because of, Plaintiff's threats. Plaintiff relies

---

[6]Strangely, Plaintiff does not compare security at the school prior to October 24, 2006, as compared to security after the threats.

heavily on an article in the Hannibal Courier Post wherein Hannibal Chief of Police Lyndell Davis claimed that the increased security "was not in reaction to anything." (Doc. No. 45-12). In his affidavit, Davis stated the police department recommended, prior to October 24, 2006, that access to the Hannibal High School should be reduced to two doorways at the front of the school and the north side of the building and that the southern entrance be left open before school began and monitored by school personnel until 7:45 a.m., when it would be locked. (Doc. No. 45-23).

Defendants acknowledge that the Hannibal police department recommended increased security measures, but Defendants provide evidence that those recommended changes were not implemented until after the October 24, 2006 threats and the changes remained in effect only until November 3, 2006. (Defendants' Reply Memorandum in Support of Their Motion for Summary Judgment ("Reply"), Doc. No. 52, pp. 5-6; DSUMF, ¶ 44). Janes and Powell both attested that the changes were not made until, and in response to, the October 24, 2006 incident. (Reply, pp. 5-6; DSUMF, ¶ 42). In the Hannibal Courier Post article, Powell asserted that the October 24, 2006 threat "accelerated the process a little bit" to implement the suggestions proposed in the October 20, 2006 meeting. (Doc. no. 45-12).[7] The increased security measures included: (1) locking all access points to the high school, (2) locating additional school personnel throughout the building, and (3) assigning staff to monitor the school's parking lot. (DSUMF, ¶ 41; Doc. No. 45-17, pp. 75-76; Doc. No. 45-18, pp. 21-26). Teachers were required to perform these additional duties during their planning periods. (DSUMF, ¶ 43; Doc. No. 45-17, pp. 75-76; Doc. No. 45-18, pp. 21-26).

Accordingly, the evidence before the Court is that school was substantially disrupted because of Plaintiff's threats. Under the Tinker test, Defendants could punish Plaintiff for his disruptive

---

[7]In an affidavit, Danny Henley, a Hannibal Courier Post newspaper reporter, simply stated that article for the Hannibal Courier Post newspaper properly reported the statements made by Janes, Powell and Davis. (Doc. No. 45-24).

statements without violating his First Amendment rights. For this reason, in addition to the Court's holding that Plaintiff's statements constitute "true threats," summary judgment is granted in favor of Defendants on Count II.

## III. QUALIFIED IMMUNITY

Defendant Janes asserts that she is entitled to qualified immunity for Plaintiff's claims under § 1983. (Memorandum in Support, pp. 21-23). "Qualified immunity may protect government officials from liability under 42 U.S.C. § 1983, but not if their conduct violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" Nelson v. Corr. Med. Servs., 583 F.3d 522, 527 (8th Cir. 2009) (citing Hope v. Pelzer, 536 U.S. 730, 739, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002) (quotation omitted)). In analyzing the officials' claim of qualified immunity, courts consider two questions: (1) whether the facts that a plaintiff has alleged or shown, when viewed in the light most favorable to Plaintiff, support a finding that the conduct of Defendants violated a constitutional right, and (2) whether that constitutional right was "clearly established" such that a reasonable official would have known that his or her actions were unlawful. Nelson, 583 F.3d at 528 (citing Pearson v. Callahan, 129 S. Ct. 808, 815-16, 172 L. Ed. 2d 565 (2009)). "'To overcome the defense of qualified immunity, a plaintiff must show: (1) the facts, viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a constitutional or statutory right; and (2) the right was clearly established at the time of the deprivation.'" McRaven v. Sanders, 577 F.3d 974, 980 (8th Cir. 2009) (quoting Howard v. Kansas City Police Dep't., 570 F.3d 984, 988 (8th Cir. 2009)).

The Court finds the Janes is entitled to qualified immunity on Plaintiff's 42 U.S.C. §1983 claim. As discussed above, Janes's conduct did not violate Plaintiff's clearly established First Amendment rights. Plaintiff was suspended because he made statements that constituted a "true

threat" and that were not protected by the First Amendment. Further, Plaintiff's statements caused a substantial disruption at Hannibal High School. Plaintiff's actions violated school policy. (Doc. No. 42-13; DSUMF, ¶58). Janes, through the Board, had the authority to suspend Plaintiff. R.S. Mo. § 167.161; DSUMF, ¶ 59. Janes is entitled to qualified immunity for the 42 U.S.C. §1983 claims against her.

## IV.   ADMINISTRATIVE REVIEW (COUNT I)

In Count I, Plaintiff prays for "a judicial review of the long-term suspension of DJM [and] for an order rescinding said suspension." (Amended Complaint, p. 3). Pursuant to Missouri statute, Plaintiff is entitled to a review of the Board's administrative decision. See R.S. Mo. § 536.100 (providing for judicial review of a final decision in a contested case).[8] The District puts forth three grounds for why Plaintiff is not entitled to judicial review and they are entitled to summary judgment on Count I.

First, the District argues, as it did in its Motion to Dismiss, that Plaintiff's claim in Count I must be considered moot. (Memorandum in Support, pp. 23-25). The District notes that, because Plaintiff completed high school, a rescission of the suspension would have no "practical effect" on his academic status. Although Plaintiff's records would still reflect his suspension, The District asserts that his disciplinary records are only available to Plaintiff and the District staff. (Memorandum

---

[8] Plaintiff claims that he is entitled to a trial *de novo* pursuant to a non-existent state statute, R.S. Mo. § 671.161.3. (Response, p. 15).

The Court assumes, for purposes of this summary judgment, that this is a contested case. "'Contested case' means a proceeding before an agency in which legal rights, duties or privileges of specific parties are required by law to be determined after hearing." § 536.010(4) R.S.Mo. The review of a contested case is a review by the trial court of the record created before the administrative body. § 536.140 R.S.Mo. "Non-contested cases do not require formal proceedings or hearings before the administrative body." City of Valley Park v. Armstrong, 273 S.W.3d 504, 506 (Mo. 2009) (citation omitted). In the review of a non-contested decision, the circuit court does not review the administrative record, but hears evidence, determines facts, and adjudges the validity of the agency decision as an original action. Id.

in Support, p. 24). Disciplinary records are not available to the public at large. See 20 U.S.C. §1232g(b); 34 C.F.R. §99, *et seq*. The District claims that it will not send a student's disciplinary records in response to any employer's or institute of higher education's request for records. (Memorandum in Support, p. 25). The District's policy only permits sending discipline records to third parties if it receives the student's express written consent. (Id.)

The Court cannot find, as a matter of law, that the controversy is moot. Although significant procedural protections appear to be in place, the disclosure of Plaintiff's disciplinary past remains possible. For example, it may be possible to obtain Plaintiff's disciplinary records as part of criminal investigation or case. The Court cannot find Plaintiff's claim for administrative review moot.

Second, the District argues that Plaintiff failed to attach the District's disciplinary decision, which is required for review. See Memorandum in Support, pp. 25-26; Reply, p. 8 (citing City of Valley Park, 273 S.W. 3d at 506-07. The Board's Findings of Facts and Conclusions of Law was attached to Plaintiff's First Amended Petition, which was included in the pleadings removed from state court to this Court. The disciplinary decision is before the Court and available for review. The Court denies summary judgment on Count I on this basis.

Finally, the District asks that this Court find that Plaintiff's discipline was legitimate and reasonable. (Memorandum in Support, pp. 26-27). This Court only has federal claim jurisdiction pursuant to Plaintiff's dismissed 42 U.S.C. §1983 claim. Pursuant to § 536.100, proceedings for review should be held "in the circuit court." Accordingly, this Court remands this case to the Circuit Court of Cole County for a hearing consistent with this Order.

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment (Doc. No. 41) is **DENIED**, in part, and **GRANTED**, in part.

**IT IS HEREBY FURTHER ORDERED** that this case is **REMANDED** to the Circuit Court of the Monroe County, Missouri. An appropriate Order of Remand will accompany this Order.

Dated this 25th day of January, 2009.

/s/ Jean C. Hamilton

UNITED STATES DISTRICT JUDGE